DANIELS CABLEVISION,
INC., Plaintiff,

v.

UNITED STATES of America, Defendant.

TIME WARNER ENTERTAINMENT
COMPANY, L.P., Plaintiff,

v.

FEDERAL COMMUNICATIONS
COMMISSION, et al.,
Defendants.

DISCOVERY COMMUNICATIONS,
INC., et al., Plaintiffs,

v.

UNITED STATES of America,
et al., Defendants.

Civ.A. Nos. 92–2292, 92–2494 and 92–2558.

United States District Court,
District of Columbia.

Sept. 16, 1993.

John Pope Cole, Jr., Cole, Raywid & Braverman, Washington, DC, for Daniels Cablevision, Inc.

Andrew Jay Schwartzman, Amedia Access Project, Washington, DC, for Consumer Federation of America, National Council of Sen-

ior Citizens, International Ass'n of Machinists and Aerospace Workers, AFL–CIO, Office of the United Church of Christ.

Mark Henry Lynch, Covington & Burling, Washington, DC, for Association of America's Public Television Stations, Public Broadcasting Service, Corporation for Public Broadcasting.

Roy F. Perkins, Jr., Herndon, VA, for Triplett & Associates, Inc.

Robert T. Perry, Brooklyn, NY, for Paging Associates, Inc., International Television Broadcasting, Inc., Sandra Engle, TV 58 St. Louis, Inc., Morningstar Communications, Zantech, Inc., International Broadcasting Network, Sherjan Broadcasting Co., Inc.

Theodore Case Whitehouse, Brian Conboy, Willkie, Farr & Gallagher, Washington, DC, Robert D. Joffe, Cravath, Swaine & Moore, New York City, for Time Warner Entertainment Co., L.P.

James Edwin Meyers, Baraff, Koerner, Olender & Hochberg, Washington, DC, for Encore Media Corp.

Paul J. Sinderbrand, Keck, Mahin & Cate, Washington, DC, for Wireless Cable Association Intern., Inc.

Allan Abbot Tuttle, Patton, Boggs & Blow, Washington, DC, for Discovery Communications, Inc., The Learning Channel, Inc.

## MEMORANDUM AND ORDER

JACKSON, District Judge.

The plaintiffs in these three lawsuits present facial constitutional challenges to eleven provisions of the Cable Television Consumer Protection and Competition Act of 1992, Pub.L. No. 102–385, 106 Stat. 1460, and to two provisions of the Cable Communications Policy Act of 1984, Pub.L. No. 98–549, 98 Stat. 2780 ("the Cable Act" or "Acts"), contending that, for sundry reasons, these provisions infringe upon their First Amendment right to freedom of speech.[1] No other infirmities are alleged in these actions, however, and the Court is therefore not called upon to address other constitutional issues that may lurk elsewhere in this landmark legislation.

The Court holds that section 11(c) of the 1992 Cable Act (insofar as it amends the Communications Act of 1934 to include new section 613(f)(1)(A)), and sections 15 and 25 of the 1992 Cable Act are unconstitutional. It concludes that all of the remaining provisions of the 1992 and 1984 Cable Acts in dispute are facially compatible with the First Amendment.

## I.

The 1992 Cable Act subjects the cable television industry to extensive and unprecedented federal regulation. Controversial from the moment the legislation was first proposed, it was immediately assailed once enacted from several quarters in these and other lawsuits. The plaintiffs here are cable television system owner/operators and programmers. The named defendants are the United States and the Federal Communications Commission ("the FCC" or "the Commission"), the administrative agency charged with its enforcement.[2] The plaintiffs contend that multiple provisions of the 1992 Cable Act (and, in retrospect, others of its ancestor, the 1984 Cable Act), unconstitutionally interfere with their First Amendment right to "speak" as they wish through the cable tele-

---

1. Specifically, the plaintiffs in *Time Warner Co. v. FCC*, challenge sections 3, 7(b), 7(c), 9, 10(d), 11, 15, 19, 24 and 25 of the 1992 Act (to be codified at, creating, or amending, respectively, 47 U.S.C. §§ 543, 541(a)(4), 541(f), 532, 558, 533, 544(d), 548, 555a, & 335), and sections 611 and 612 of the 1984 Act (codified at 47 U.S.C. §§ 531 & 532 (1988)). The plaintiffs in *Discovery Communications, Inc. v. United States*, Civ. No. 92–2558, join Time Warner's challenge to sections 3 and 9 of the 1992 Cable Act. The plaintiffs in *Daniels Cablevision, Inc. v. United States*, Civ. No. 92–2292, challenge section 6 of the 1992 Cable Act (amending 47 U.S.C. § 325).

2. During the pendency of this litigation, numerous interested parties have sought to intervene as plaintiffs or defendants. The applications for intervention have been held in abeyance, but all of these applicants, together with several *amicus curiae* applicants, have been granted leave to participate herein as *amici*. All applicants for intervention have been permitted to file motions and memoranda as exhibits to their motions for intervention, and the Court has considered the entire record amassed in this case.

vision systems they own, control or use, to the audiences of their choice.

Two other lawsuits, in which the plaintiffs challenged two particular provisions of the 1992 Act on similar grounds, were filed within days of the three lawsuits now before this Court.[3] All plaintiffs in all five lawsuits challenged sections 4 and 5 of the 1992 Cable Act (creating 47 U.S.C. §§ 534 & 535), the so-called "must-carry" provisions, which require cable operators to carry programming originating with certain over-the-air television broadcasters whose signals coincide with cable operators' service areas, and all five cases were consolidated as related cases. Thereafter, the claims in all cases challenging the constitutionality of the must-carry provisions were severed for hearing, as the statute expressly requires, by a three-judge district court convened in accordance with section 23 of the 1992 Cable Act. See Turner Broadcasting System, Inc. v. FCC, 810 F.Supp. 1308 (D.D.C.1992).[4] All of the plaintiffs' claims other than those involving the must-carry provisions are presently before this single-judge district court on the summary judgment motions of each of the plaintiffs; on the cross-motions for summary judgment of the federal defendants; and on the briefs and dispositive motions of the several applicants for intervention and amici.

## II.

Starting from the premise of the Must–Carry Opinion —that the 1992 Cable Act is essentially a regulatory measure of economic rather than ideologic import—much of its reasoning is apposite to a decision with respect to the remainder of the Act. Congress undertook to expand and tighten government's control over that segment of the television market in which the plaintiffs traded, namely the business of delivering video signals to a major portion of the nation's homes. Congress was largely unconcerned with what was being said with those signals. It was concerned, however, that the plexuses of wires linking video "speakers" and most of the television receivers across the country remain open to transmit a diverse mix of "voices," not only the messages chosen for delivery by those who owned or controlled the cables.

Several of the provisions of the 1992 Cable Act avowedly inhibit the cable operators and programmers in making full use of the capabilities of their systems to deliver signals to their subscribers. The plaintiffs challenge these provisions largely on the same grounds on which they based their challenge to the must-carry provisions in sections 4 and 5 of the 1992 Act. See Must–Carry Opinion, supra note 4. The Act, in effect, confiscates a portion of those capabilities for use by others. In First Amendment terms—insofar as plaintiffs are deemed to be "speakers," i.e., purveyors of messages rather than of message-bearing electronic impulses—Congress has deprived them of unlimited choice as to the messages they will deliver, to whom they may deliver them, and the "speakers" for whom they will do so. It is for these reasons, as some cases have held in other contexts, that the cable operators argue that the provisions must be strictly scrutinized.

 As the Must–Carry court observed, however, in its opinion rejecting similar challenges to the must-carry provisions, the crucial inquiry for determining the appropriate level of First Amendment scrutiny is not merely whether governmental regulation results in compelling certain speech, fetters the speaker's discretion in deciding what to say, or favors particular speakers at the expense of others, but is also whether the regulation is, overtly or covertly, content-based; that is, the government is telling the speaker what can or cannot be said. Constraints on speech, even if deriving from an exercise of governmental authority, need be strictly scrutinized only if the government has specified the speaker's message. See Turner Broadcasting, 819 F.Supp. at 42. Although the provisions at issue here may impose some limit on the autonomy of cable

---

**3.** Turner Broadcasting System, Inc. v. FCC, Civ. No. 92–2247 and National Cable Television Assoc., Inc. v. United States, Civ. No. 92–2495.

**4.** The three-judge district court, in a divided decision, upheld sections 4 and 5 of the 1992 Act. See Turner Broadcasting System, Inc. v. FCC, 819 F.Supp. 32 (D.D.C.1993) (three-judge court) [hereinafter Must–Carry Opinion].

operators to speak only such speech as they would themselves pronounce, most do so only to serve regulatory goals unrelated to content. Accordingly, these other provisions, too, are constitutional, as was the case with *Must-Carry*, if those goals serve significant governmental interests and do not burden substantially more speech than necessary to serve these interests. *Ward v. Rock Against Racism*, 491 U.S. 781, 799, 109 S.Ct. 2746, 2758, 105 L.Ed.2d 661 (1989); *United States v. O'Brien*, 391 U.S. 367, 377, 88 S.Ct. 1673, 1679, 20 L.Ed.2d 672 (1968).[5]

*Mandatory Carriage of Public, Educational, and Governmental ("PEG") Programming and Leased Access Channels; Rate Regulation; Restrictions on Vertically Integrated Programmers.*

■ Section 7(b) of the 1992 Act, in conjunction with section 611 of the 1984 Act, the "PEG programming" provisions, allows local franchising authorities to require that franchise proposals submitted by aspiring cable operators contain assurances that a portion of their channel capacity will be designated for "public, educational, or governmental use." Once the franchise is awarded, the franchising authority may enforce these "PEG" commitments, 47 U.S.C. § 531(c) (1988), and the franchisee is not thereafter permitted to exercise any editorial control over the PEG programming it is obliged to carry. *Id.* § 531(e).

Section 612(b) of the 1984 Act, the "leased access" provisions, obligates cable operators to reserve channel capacity for use by commercial programmers that are unaffiliated

with the operator.[6] 47 U.S.C. § 532(b)(1) (1988). Again the cable operator is prohibited from exercising editorial control over its lessees' programming, except to the extent that it may consider content in establishing a reasonable price to charge the unaffiliated lessee, *id.* § 532(c), and it may also decline to carry programming that it reasonably believes to be obscene. 1992 Cable Act § 10(a).

Section 19 of the 1992 Act, the "vertical integration" provisions, regulates the conduct of programmers in which a cable system operator has an attributable (i.e., a property) interest ("vertically integrated programmers" or "VPs"). Section 19 directs the FCC to promulgate regulations to "prohibit discrimination [by vertically integrated programmers] ... in the prices, terms, and conditions of sale or delivery of ... cable programming ... between cable systems...." 1992 Cable Act § 19(c)(2)(B). This provision would apply, for example, to a VP offering its product to an affiliated operator upon more favorable terms than to independent operators. Aggrieved cable operators may initiate an adjudicatory proceeding before the Commission, which has authority to impose reasonable prices or conditions of sale and may assess monetary penalties for noncompliance. *Id.* §§ 19(d) and (e). Section 19 also directs the FCC to adopt regulations prohibiting exclusive distribution contracts between VPs and operators.[7] *Id.* § 19(c)(2)(C).

Section 3 of the 1992 Act, the "rate regulation" provisions, requires cable operators to provide all subscribers with a basic service tier containing all section 4 and 5 mandatory carriage broadcast stations; all public, edu-

5. In *O'Brien,* the Supreme Court held that a federal statute making destruction of a selective service registration card a criminal offense did not abridge the freedom of speech of an anti-war protester who burned his draft card to express his opposition to military service. *Ward* upheld municipal regulations governing sound amplification at outdoor musical performances in a public park. Both cases thus found legitimate governmental purposes unrelated to what the objecting "speaker" wanted to say—efficient administration of the draft in the former; noise abatement in the latter—sufficient to justify the incidental curtailment of expressive license the legislation worked.

6. Mid-sized systems (36–54 activated channels) must reserve 10 percent of their uncommitted

channels, i.e., channels which are not otherwise required for a designated use or the use of which is not prohibited by law, for such use, 47 U.S.C. § 532(b)(1)(A) (1988); large systems (55–100 activated channels) must dedicate 15 percent of their uncommitted channels, *id.* § 532(b)(1)(B), and very large systems (over 100 activated channels) must dedicate 15 percent of all of their channels to such use, *id.* § 532(b)(1)(C).

7. The FCC may, however, permit an exclusive distribution contract in any area that was served by cable on October 5, 1992 if the Commission finds such a contract to be in the public interest. 1992 Cable Act § 19(c)(2)(D).

cational or governmental stations which must be carried pursuant to the franchise; and all regular non-satellite broadcast stations regularly transmitted by the operators. The FCC and local franchise authorities are empowered to ensure that the rates charged by cable systems subject to rate regulation [8] for the basic tier are reasonable, and the FCC is directed to establish a regulatory regime to entertain challenges to the reasonableness of rates charged for all other non-premium channels.[9] Section 3 also requires all operators to maintain a uniform rate structure throughout the geographic region in which the operator offers its services. Finally, section 3 prohibits operators from requiring subscribers to purchase any service, other than the basic tier, as a precondition to receiving any other pay-per-view or pay-per-channel service, and the price structure for such channels must be uniform regardless of the quantity of services ordered by a subscriber.

The operators take issue with each of these provisions arguing, *inter alia*, that they interfere with their ability to design the packages of services that they would like to offer their subscribers. The programmers object to them on the ground that the provisions make it more difficult for operators to carry the products of certain programmers, and in consequence prevent the programmers from reaching their optimum audience.

Specifically, to use First Amendment lexicon, the plaintiffs reiterate that the PEG programming and leased access provisions force operators to engage in "speech" they might not otherwise undertake, and favor the speech of PEG programmers and non-affiliates over that of the operators themselves or other programmers the government deems less worthy. The vertical integration provisions, they say, interfere with their ability to "speak" to whom they like. Restrictions on the programmers' ability to offer special deals and conditions of delivery to certain operators will reduce the operators' incentive to carry them; without the ability to negotiate exclusive contracts or obtain special deals, the operators profess to be unable to create innovative program line-ups to differentiate their products from those of competitors. Finally, the plaintiffs contend that rate regulation burdens the speech of operators directly, and the programmers indirectly, by setting limits on the prices that subscribers can be charged. The Court holds that these provisions all are content-neutral, are thus subject to *O'Brien/Ward* balancing only, and that they withstand that level of scrutiny.

The PEG and leased access provisions were enacted to serve a significant regulatory interest, *viz.*, affording speakers with lesser market appeal access to the nation's most pervasive video distribution technology. H.R.Rep. No. 934, 98th Cong., 2d Sess. (1984), *reprinted in* 1984 U.S.C.C.A.N. at 4655, 4667. Enabling a broad range of speakers to reach a television audience that otherwise would never hear them is an appropriate goal and a legitimate exercise of federal legislative power. *See Chicago Cable Communications v. Chicago Cable Commission*, 879 F.2d 1540, 1549–50 (7th Cir.1989); *Telesat Cablevision, Inc. v. City of Riviera Beach*, 773 F.Supp. 383, 412 (S.D.Fla.1991); *cf. Capital Cities Cable, Inc. v. Crisp*, 467 U.S. 691, 714, 104 S.Ct. 2694, 2708, 81 L.Ed.2d 580 (1984); *United States v. Mid-*

---

**8.** A cable system is subject to rate regulation only if it is not otherwise subject to "effective competition." Under section 3, effective competition means that

"(A) fewer than 30 percent of the households in the franchise area subscribe to the cable service of a cable system;

(B) the franchise area is—

(i) served by at least two unaffiliated multichannel video programming distributors each of which offers comparable video programming to at least 50 percent of the households in the franchise area; and

(ii) the number of households subscribing to programming services offered by multichannel

video programming distributors other than the largest multi-channel video programming distributor exceeds 15 percent of the households in the franchise area; or

(C) a multichannel video programming distributor operated by the franchising authority for that franchise area offers video programming to at least 50 percent of the households in that franchise area."

**9.** Section 9 of the Act similarly requires the FCC *to set maximum reasonable rates for the amounts an operator may charge leased access programmers for carriage.*

*west Video Corp.*, 406 U.S. 649, 668–70, 92 S.Ct. 1860, 1871–72, 32 L.Ed.2d 390 (1972) (plurality opinion); *see Turner Broadcasting*, 819 F.Supp. at 45–46.

The leased access provisions are likewise content-neutral, and they are designed to serve a similar market regulatory function. The provisions promote fair competition by overcoming the natural tendency of cable operators to enhance the profitability of their affiliated programmers. *See* S.Rep. No. 92, 102d Cong., 1st Sess. 29–32 (1991); 1992 U.S.C.C.A.N. 1133; H.R.Rep. No. 934, 98th Cong., 2d Sess. (1984), *reprinted in* 1984 U.S.C.C.A.N. at 4667–73; *see* 47 U.S.C. § 532(a) (1988).

Nor do the PEG and leased access provisions overreach. PEG use is negotiable, and leased access obligations are directly proportional to the number of channels a cable operator has available, never exceeding 15 percent of total capacity. Operators retain discretion over the remainder, and may, of course, utilize them as they wish, for their own programming or for that of affiliated programmers.

The constraints placed upon VPs by section 19 are also content-neutral regulatory measures designed to correct a market to which access was controlled by those who own the technology. Congress discovered an altogether understandable tendency on the part of operators to give preferential treatment to those programmers in which the operator has an economic interest. 1992 Cable Act § 2(a)(5); S.Rep. No. 92, 102d Cong., 1st Sess. 24–29 (1991); H.R.Rep. No. 628, 102d Cong., 2d Sess. 41 (1992). The vertical

integration regulations, based on a speech-neutral programmer characteristic, i.e., the economics of ownership, is entirely unrelated to the content of any program.

The burden is, in fact, relatively minor. The provisions do not prohibit any programmer from dealing with any operator altogether; they merely prohibit discrimination and exclusivity agreements.[10] Programmers remain free to market their services to any operators they choose, and, conversely, operators are free to choose among the products of all programmers. *See Heffron v. International Society for Krishna Consciousness*, 452 U.S. 640, 655, 101 S.Ct. 2559, 2567, 69 L.Ed.2d 298 (1981).[11]

The rate regulation provisions in section 3 are wholly unrelated to content. They are triggered by the content-neutral threshold determination of whether an operator is subject to effective competition. Rate regulation was designed to reduce anti-competitive operator practices, to combat concentration in the industry, and, simply put, to keep rates affordable to the public, regardless of message. *See* 1992 Cable Act § 2(a); S.Rep. No. 92, 102d Cong., 1st Sess. 4–8 (1991); H.R.Rep. No. 628, 102d Cong., 2d Sess. 30–34 (1992). Moreover, not only is Section 3 operable only in the absence of effective competition, Congress has provided the FCC with standards to determine whether operator rates are reasonable—all of them of a cost accounting nature—eliminating any incentive on the part of the FCC to make discretionary rate-making judgments on the basis of perceived programming merit.[12]

---

**10.** The FCC does, however, have discretion to permit exclusive contracts in specific cases.

**11.** Section 11 of the Act directs the FCC to establish "reasonable limits on the number of channels on a cable system that can be occupied" by vertically integrated programmers. Like the other vertical integration restrictions, the channel occupancy limits appear unrelated to content.

Whether or not the regulations ultimately promulgated by the Commission will pass constitutional muster under *O'Brien/Ward* is, of course, at this point unclear.

**12.** In developing a scheme for determining the reasonableness of rates, the Commission is directed to consider

"(i) the rates for cable systems, if any, that are subject to effective competition;

(ii) the direct costs (if any) of obtaining, transmitting, and otherwise providing signals carried on the basic service tier, including signals and services carried on the basic service tier [voluntarily by the operator], and changes in such costs;

(iii) only such portion of the joint and common costs (if any) of obtaining, transmitting, and otherwise providing such signals as is determined, in accordance with regulations prescribed by the Commission, to be reasonably and properly allocable to the basic service tier, and changes in such costs;

(iv) the revenues (if any) received by a cable operator from advertising from programming that is carried as part of the basic service tier or

### III.

Three provisions in the 1992 Cable Act appear clearly unconstitutional, either because they overtly impose content-related burdens on speech, or because they do not serve any identifiable regulatory purpose of significance to justify even the incidental burdens they impose. These provisions are the direct broadcast satellite ("DBS") service obligations; the premium channel notice provisions; and the provisions placing quotas on the number of subscribers allowed per cable operator.

*Direct Broadcast Satellite Service Provisions*

Section 25 of the 1992 Cable Act directs the FCC to impose mandatory carriage requirements on providers of direct broadcast satellite ("DBS") services. DBS distributors transmit their signals *via* earth-orbiting satellites directly into subscribers' receivers through dish antennas, not over coaxial cable strung along public rights-of-way. As a condition to authorization or renewal of any DBS service license, the DBS provider must allocate four to seven percent of its transmission capacity to "noncommercial programming of an educational nature."

■ The federal defendants protest at the outset that the plaintiffs presently before the Court do not have standing to challenge section 25 because none of them happen to be DBS service providers. Some of the plaintiffs, however, are programmers who market their wares to DBS distributors, and who have alleged that because of the DBS set-aside for educational programming they will find themselves in competition for fewer channel positions. The asserted injury is traceable to section 25, and it clearly would by remedied by the declaratory relief the plaintiffs seek. Accordingly, the plaintiffs

meet the requirements for Article III standing. *See Allen v. Wright*, 468 U.S. 737, 751–52, 104 S.Ct. 3315, 3324–25, 82 L.Ed.2d 556 (1984).

■ The plaintiffs contend that the DBS educational programming set-aside is content-based.[13] *Cf. Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976); *see also City of Cincinnati v. Discovery Network, Inc.*, —— U.S. ——, —— – ——, 113 S.Ct. 1505, 1516–17, 123 L.Ed.2d 99 (1993). The DBS service provisions accord a preference to speakers whose ostensible mission is to enlighten rather than entertain, and therefore, have implicitly been judged by Congress to be more worthy of an audience. Nevertheless, the Court finds that it need not decide whether a preference for "noncommercial programming of an educational nature" is more content-related than, for example, the "local" broadcasting at issue in *Must–Carry*, because, to the extent it subsumes a content component at all, even under *O'Brien/Ward* scrutiny, the DBS provisions must fail.

There is absolutely no evidence in the record upon which the Court could conclude that regulation of DBS service providers is necessary to serve any significant regulatory or market-balancing interest. There is nothing in the record purporting to demonstrate that educational television is presently in short supply in the homes of DBS subscribers, nor is there a reason to conclude that section 25 was designed (or deemed necessary) by Congress to quell anti-competitive DBS provider practices. In the absence of a record identifying a valid regulatory purpose or some other legitimate government interest to be advanced by conscripting DBS channel space, there is no justification for any First

---

from other consideration obtained in connection with the basic service tier;

(v) the reasonably and properly allocable portion of any amount assessed as a franchise fee, tax, or charge of any kind imposed by any State or local authority on the transactions between cable operators and cable subscribers or any other fee, tax, or assessment of general applicability imposed by a governmental entity applied against cable operators or cable subscribers;

(vi) an amount required, in accordance with paragraph (4), to satisfy franchise requirements to support public, educational, or governmental

channels or the use of such channels or any other services required under the franchise; and

(vii) a reasonable profit, as defined by the Commission consistent with the Commission's obligations to subscribers under [this section]."

**13.** The Act's legislative history makes clear that Congress intended the provisions to enhance the "speech" of public service groups, defined as those serving "educational, instructional, or cultural purposes." S.Rep. No. 92, 102d Cong., 1st Sess. 92 (1991).

Amendment burdens occasioned by section 25. *Accord Quincy Cable TV, Inc. v. FCC,* 768 F.2d 1434, 1457 (D.C.Cir.1985), *cert. denied,* 476 U.S. 1169, 106 S.Ct. 2889, 90 L.Ed.2d 977 (1986).

*Premium Channel Notice Provisions*

▮ Section 15 of the 1992 Cable Act requires a cable operator to give notice to its subscribers, at least 30 days in advance, if it proposes to provide a free preview of a "premium channel"—one offering movies rated X, NC–17, or R by the Motion Picture Association of America—to entice those who do not ordinarily receive that channel to buy it. The plaintiff operators, and ENCORE, an intervenor-plaintiff offering pay-per-view movie programming services, contend that this provision is unconstitutional because it is indisputably content-related; because it burdens protected speech as well as suppressing obscenity; and because it does not survive the strict scrutiny to which such legislation must be subjected. The Court agrees.

Section 15 is content-based.[14] The section passes judgment on material on the basis of the ratings the motion picture industry assigns to the movies, which, of course, are determined in turn by the movies' content. Content-based "indecency" restrictions are constitutional only if they are a "carefully tailored" means of accomplishing a "compelling" interest. *Sable Communications v. FCC,* 492 U.S. 115, 126, 109 S.Ct. 2829, 2836, 106 L.Ed.2d 93 (1989).

Section 15 also clearly burdens at least some protected speech.[15] The notice requirements make carriage of free previews less practicable and more costly, and cable operators are dissuaded from carriage of programmers like ENCORE on their systems.

The federal defendants assert that section 15 is necessary to protect unwilling viewers, especially children, from indecent television messages which, although possibly being a compelling interest, *id.; see FCC v. Pacifica,* 438 U.S. 726, 748, 98 S.Ct. 3026, 3040, 57 L.Ed.2d 1073 (1978) (citing *Rowan v. Post Office Dept.,* 397 U.S. 728, 90 S.Ct. 1484, 25 L.Ed.2d 736 (1970)), section 15 is not, in any sense, "carefully tailored" to accomplish.

Congress has simply incorporated the Motion Picture Association's rating system as the measure of indecency; its failure to define indecency for itself, abdicating that responsibility to a trade association, is sufficient for invalidation of section 15 on overbreadth grounds.[16] The government has not and could not demonstrate that all movies rated R are indecent. *See Action for Children's Television v. FCC,* 852 F.2d 1332, 1339 (D.C.Cir.1988) (citing *City of Houston v. Hill,* 482 U.S. 451, 107 S.Ct. 2502, 96 L.Ed.2d 398 (1987)). It is simultaneously under-inclusive in failing to address identical uninvited indecency originating from non-cable television sources; the law does not apply to broadcasters that carry uncut R or NC–17 movies. Finally, it is not difficult to envision less onerous alternatives, short of continuous notice for 30 days, which would adequately alert sensitive or impressionable viewers (or their parents) to the forthcoming shock of sexually explicit material likely to offend.

Premium channels offered on cable are not "pervasive" in the *Pacifica* sense, i.e., in that questionable material ambient in the airwaves can be made to appear without warning on a television screen merely by turning on the set or throwing a channel selector switch. Like a subscription to a publication with "indecent" material or "900" telephone numbers, someone in the household must take affirmative steps to bring a premium channel into the home. *See Sable,* 492 U.S. at 127–28, 109 S.Ct. at 2837; *Bolger v.*

---

**14.** Not only does the government concede as much, *see* Federal Defendants' Memorandum at 20, the caption to section 15 makes direct reference to content. 1992 Cable Act § 15 ("Notice to Cable Subscribers on Unsolicited Sexually Explicit Programs.").

**15.** Both sides agree that movies rated X, NC–17 or R often contain material that is not obscene as that term was defined by the Supreme Court in *Miller v. California,* 413 U.S. 15, 93 S.Ct. 2607,

37 L.Ed.2d 419 (1973). Non-obscene material, even if indecent, is fully protected by the First Amendment. *Sable Communications v. FCC,* 492 U.S. 115, 126, 109 S.Ct. 2829, 2836, 106 L.Ed.2d 93 (1989).

**16.** Moreover, no notice is required for an indecent movie that has not been rated by the Association.

*Youngs Drug Products Corp.,* 463 U.S. 60, 73–74, 103 S.Ct. 2875, 2884, 77 L.Ed.2d 469 (1983). The householder must subscribe to it, and thereafter retain it by paying the bill. *Cruz v. Ferre,* 755 F.2d 1415, 1420 (11th Cir.1985). Parents also have the ability to block the reception of certain channels by use of "lock boxes" or similar devices which must be provided by cable operators on request. 47 U.S.C. § 544(d) (1988).

*Numerical Limitations on Subscribers*

■ A portion of section 11(c) of the 1992 Act directs the FCC to prescribe rules and regulations "establishing reasonable limits on the number of cable subscribers" a cable operator is authorized to reach through cable systems it owns or in which it has an attributable interest. The government contends that this provision is essential to promote competition in the cable industry; horizontal, no less than vertical, combination and expansion threaten to concentrate cable facilities in a few market-dominant entities. The plaintiffs challenge this provision on the ground that it directly interferes with the operators' ability to "speak" to as large an audience of their choice as possible. The Court holds that this provision is unconstitutional.

In *Grosjean v. American Press Co.,* 297 U.S. 233, 56 S.Ct. 444, 80 L.Ed. 660 (1936), the Supreme Court struck down a sales tax imposed on newspapers with a circulation of more than 20,000 copies per week, holding that, although newspapers may not enjoy immunity from general taxation, a tax calculated to "limit the circulation of information to which the public is entitled" is wholly inconsistent with the First Amendment. *Id.* at 250, 56 S.Ct. at 444. The plaintiffs contend that a numerical limitation on the quantity of subscribers a cable operator is permitted to enroll is constitutionally indistinguishable from a tax graduated upon the quantity of a newspaper's circulation.

The federal defendants counter that the subscription limitation statute is subject only to *O'Brien/Ward* scrutiny, serving content-neutral purposes as it does, namely, to stem horizontal concentration in the cable industry, as well as to promote diversity of speakers. Even if content-neutral, however, and *O'Brien/Ward* thus supplying the appropriate standard by which the provision is to be judged, there would appear to be no circumstances under which the FCC could adopt constitutionally compatible regulations. Even content-neutral regulations may not burden substantially more speech than necessary, and must leave open ample alternative means of reaching an audience. *See Ward,* 491 U.S. at 802–03, 109 S.Ct. at 2760. Any governmentally ordained quota on the number of subscribers a cable operator may reach leaves the operator with absolutely no intra-medium means of speaking to the remainder of its potential audience. The First Amendment protects the right of every citizen to reach the minds of any willing listeners and, thus, the speaker's opportunity to win their attention. *Heffron,* 452 U.S. at 655, 101 S.Ct. at 2567 (citations omitted).[17]

### IV.

Three of the provisions challenged by the plaintiffs fail, so far as this Court can discern, to implicate the First Amendment to any significant extent at all. These are the provisions abrogating the statutory immunity that private cable operators formerly enjoyed for liability for the transmission of obscenity; the provisions immunizing municipally owned cable operators from civil liability to private competitors for money damages; and the retransmission consent provisions. All of these provisions are compatible with the First Amendment.

*Elimination of Immunity for Obscenity Carried on PEG and Leased Access Channels*

■ As previously noted, cable operators may not exercise any editorial control over the PEG or leased access channels they are required to carry. The 1984 Act conferred immunity from state law liability upon cable operators who transmitted obscene material

---

**17.** Section 11(c) of the 1992 Act also directs the FCC to "consider the necessity and appropriateness" of limiting the extent to which operators may create cable programming. The plaintiffs facially challenge this provision as well. Although a regulation directly limiting the ability of operators to "speak" as programmers would surely be constitutionally troubling, whether and how the FCC will act is, at this point, entirely speculative.

included in the obligatory PEG and leased access programming. 47 U.S.C. § 558 (1988). Section 10(d) of the 1992 Act removes all immunity for carriage of obscenity.

The plaintiffs, and the American Civil Liberties Union as *amicus,* contend that potential liability for obscenity carried on PEG and leased access channels impermissibly burdens speech by creating an unacceptable incentive to operator self-censorship. Without immunity, they argue, operators will be forced to screen their PEG and leased access programming for material that might be deemed obscene, and the more timorous among them will become so apprehensive that they will voluntarily refuse to carry controversial programming that might nevertheless enjoy full constitutional protection.

The danger of self-censorship induced by the ambiguity inherent in the concept of obscenity itself has never been held to mandate a constitutional requirement for general immunity from obscenity laws for anyone. In other words, no speakers—cable operators included—have a constitutional *right* to immunity to relieve them of anxiety about crossing the threshold from the risqué to the obscene. Congress' earlier decision to provide cable operators with immunity was a matter of grace that it has always been free to rescind.

*Municipal Affiliation with Operators and Immunity from Damage Liability*

 Section 7(c) of the 1992 Act permits municipally owned cable enterprises to compete with private operators, and relieves municipally owned systems of franchising requirements. Section 24 of the 1992 Act exempts municipalities from civil damages liability arising out of local regulation of cable services. The plaintiffs contend that section 24 is constitutionally suspect because it raises temptation for public cable operators to censor or punish their private competitors.

Section 7(c), on its own, is innocuous. Legislation authorizing the creation of municipal cable franchises to compete with private operators does not, by itself, violate the First Amendment or raise a free speech issue. *Warner Cable Communications, Inc. v. Niceville,* 911 F.2d 634, 635–40 (11th Cir. 1990), *cert. denied,* —— U.S. ——, 111 S.Ct.

2839, 115 L.Ed.2d 1007 (1991). The plaintiffs' real quarrel is with section 24's creation of damages immunity.

To sustain this as a facial challenge, however, the plaintiffs must demonstrate that section 24 creates such a likelihood of undetectable censorship that as-applied challenges to specific acts of suspected municipal persecution of private cable operators *as they occur* will be ineffective. *Lakewood v. Plain Dealer Publishing Co.,* 486 U.S. 750, 755–69, 108 S.Ct. 2138, 2143–50, 100 L.Ed.2d 771 (1988).

Plaintiffs' premise is that immunity for civil damages alone makes censorship virtually inevitable; municipalities will view the absence of damage liability as a license to censor. The argument is suggested by the Supreme Court's disapproval of differential taxation schemes when imposed on the media, because "[t]he press plays a unique role as a check on government abuse, and a tax limited to the press [or a small segment of the press] raises concerns about censorship of critical information and opinion." *Leathers v. Medlock,* 499 U.S. 439, 445, 111 S.Ct. 1438, 1443, 113 L.Ed.2d 494 (1991) (discussing *Grosjean v. American Press Co.,* 297 U.S. 233, 56 S.Ct. 444 (1936); *Minneapolis Star & Tribune Co. v. Minnesota Commissioner of Revenue,* 460 U.S. 575, 103 S.Ct. 1365, 75 L.Ed.2d 295 (1983); and *Arkansas Writers' Project v. Ragland,* 481 U.S. 221, 107 S.Ct. 1722, 95 L.Ed.2d 209 (1987)).

The Court not only finds the hypothesis conjectural; it also concludes that the continuing availability of declaratory and injunctive relief is sufficient of itself to protect against municipal abuses of power if and when they should occur, and that municipal retaliation on the basis of content will be sufficiently apparent in the circumstances to ensure the effectiveness of "as applied" challenges.

Congress found that claims against municipalities for civil damage liability related to their regulatory activities of the cable industry were posing "a potentially crippling burden" on local governments and their ability to provide vital public services to their citizens. S.Rep. No. 92, 102d Cong., 1st Sess.

48–50 (1991). The legislative history of the 1992 Act makes clear that in delegating franchising authority to local governments in the 1984 Act, Congress never anticipated the extent of their exposure to the liability they now confront. *Id.* Elimination of that exposure is thus designed to preserve the municipal franchising and regulation scheme envisioned by the 1984 Act, a factor having nothing whatsoever to do with the operators' constitutionally vouchsafed right to criticize local authority. The differential taxation line of cases is inapposite.

*Retransmission Consent*

■ Section 6 of the 1992 Act directs the FCC to implement regulations prohibiting cable operators from carrying broadcast signals without the consent of the originating broadcaster. In conjunction with the must-carry provisions of section 4 of the 1992 Act, section 6 thus provides broadcasters with the enviable election between demanding mandatory carriage of the programming they cannot sell, and negotiating a price for that which is in demand. Daniels Cablevision, Inc. ("Daniels") perceives the effect of section 6 as a "prior restraint" on cable operators' speech because it places a condition on their carriage of material that the broadcaster itself has placed in the public domain.

Congress has independent constitutional authority, however, to provide creative artists—and broadcasters are arguably such—with copyright protection for their work. U.S. Const. Art. I, § 8, cl. 8; *see United Video, Inc. v. FCC,* 890 F.2d 1173, 1191 (D.C.Cir.1989). Daniels responds that while Congress might have extended copyright protection to broadcasters it has not done so, at least in so many words. Instead, Daniels argues, Congress has passed a separate law ostensibly having to do with telecommunications, never once adverting to its copyright powers.

Similar arguments were dismissed by the D.C. Circuit in *United Video.* Congress clearly could have amended the copyright law to provide infringement remedies for cable retransmission of broadcast material. But it is not constitutionally significant that Congress has done in the Cable Act what it otherwise could have done in the Copyright Act. Whatever title of the United States Code Congress chooses to place its law in, the law is still authorized by Congress' Article I power. *United Video,* 890 F.2d at 1191; *see Zacchini v. Scripps–Howard Broadcasting Co.,* 433 U.S. 562, 97 S.Ct. 2849, 53 L.Ed.2d 965 (1977).

For the foregoing reasons, it is, this 16th day of September, 1993,

ORDERED, that the plaintiffs' motions for summary judgment on the claims other than must-carry are granted in part and denied in part; and it is

FURTHER ORDERED, that the federal defendants' motion for summary judgment on the claims other than must-carry is granted in part and denied in part; and it is

FURTHER ORDERED, that judgment is entered in favor of the plaintiffs insofar as they have challenged as unconstitutional sections 15 and 25 of the 1992 Cable Act and that portion of section 11(c) of the 1992 Cable Act amending the Communications Act of 1934 to include new section 613(f)(1)(A); and it is

FURTHER ORDERED, that the plaintiffs' claims, insofar as they challenge sections 3, 6, 7(b)(4)(B), 7(c), 9, 10(d), 19 and 24 of the 1992 Cable Act, those portions of section 11 of the 1992 Cable Act not declared unconstitutional by this Court, and sections 611 and 612 of the 1984 Act, will be dismissed with prejudice; and it is

FURTHER ORDERED, the Court being of the opinion that controlling questions of law are involved herein as to which there is substantial ground for difference of opinion, and that an immediate appeal may materially advance the ultimate termination of this litigation, pursuant to 28 U.S.C. § 1292(b), that all further proceedings herein, including determination and imposition of the relief appropriate in the circumstances, are stayed pending completion of proceedings on any appeal permitted to be taken herefrom on application therefor made within 10 (ten) days; and it is

FURTHER ORDERED, that all other pending motions herein (except motions for

intervention which are held in abeyance) are denied as moot.