**TIME WARNER ENTERTAINMENT CO., L.P., Appellee,**

v.

**UNITED STATES of America, Appellant.**

No. 96–5272.

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 3, 1999.

Decided May 19, 2000.

Robert D. Joffe argued the cause for appellee. With him on the briefs was Henk Brands. Stuart W. Gold entered an appearance.

Jacob M. Lewis, Attorney, U.S. Department of Justice, argued the cause for appellant. With him on the brief were David W. Ogden, Acting Assistant Attorney General, Mark B. Stern, Attorney, Wilma A. Lewis, U.S. Attorney, Christopher J. Wright, General Counsel, Federal Communications Commission, Daniel M. Armstrong, Associate General Counsel, and James M. Carr, Counsel. William E. Kennard, General Counsel, and C. Grey Pash, Jr., Counsel, entered appearances.

Andrew Jay Schwartzman, Angela J. Campbell and Randi M. Albert were on the brief for amici curiae Center for Media Education, Association of Independent Video and Filmmakers, National Association of Artists' Organizations, National Alliance for Media Arts and Culture, Consumer Federation of America, National Council of Senior Citizens, and Office of Communication, Inc. of the United Church of Christ.

Before: GINSBURG, ROGERS and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge GINSBURG.

GINSBURG, Circuit Judge:

The Time Warner Entertainment Company and the United States appeal from portions of the judgment in *Daniels Cablevision, Inc. v. United States*, 835 F.Supp. 1 (D.D.C.1993). At issue is the facial constitutionality of two provisions of the Cable Television Consumer Protection and Competition Act of 1992, Pub.L. No. 102–385, 106 Stat. 1460 (1992 Cable Act). The "subscriber limits provision" directs

the Federal Communications Commission to limit the number of subscribers a cable operator may reach. 47 U.S.C. § 533(f)(1)(A). The "channel occupancy provision" directs the Commission to limit the number of channels on a cable system that may be devoted to video programming in which the operator has a financial interest. *Id.* § 533(f)(1)(B). Time Warner argues that both provisions facially—that is, no matter how sensitively or sensibly they might be implemented—violate the First Amendment to the Constitution of the United States; the Commission argues the opposite. We conclude that both provisions are facially constitutional.

## I. Background

Time Warner and other owners of cable television systems challenged the constitutionality of the subscriber limits, the channel occupancy, and various other provisions of the 1992 Cable Act in *Daniels Cablevision*. Upon cross-motions for summary judgment, the district court held that the subscriber limits provision is unconstitutional, *see* 835 F.Supp. at 10, but the channel occupancy provision is constitutional, *see id.* at 7 & n. 11.* The Government appealed the former ruling while Time Warner appealed the latter.

We consolidated both appeals with Time Warner's petition to this court for review of the regulations the Commission had promulgated to implement the two provisions. *See Time Warner Entertainment Co., L.P. v. Federal Communications Comm'n (Time Warner)*, 93 F.3d 957, 979–80 (D.C.Cir.1996). In September 1999, however, after the consolidated cases had been scheduled for oral argument, the Commission initiated further rulemaking proceedings with respect to the two provisions. Consequently, we severed Time Warner's statutory challenges from its pe-

---

* The district court at least appears to have found the channel occupancy provision constitutional on its face. The court noted in a footnote that "[l]ike the other vertical integration restrictions, the channel occupancy limits appear unrelated to content. Whether or not the regulations ultimately promulgated by the Commission will pass constitutional muster under [intermediate scrutiny] is, of course, at this point unclear." 835 F.Supp. at 7 n. 11.

tition for review of the regulations, held the latter in abeyance pending the completion of the further rulemaking, and heard oral argument on the constitutionality of the two statutory provisions that we address today.

## II.   Analysis

We review *de novo* the district court's grant of summary judgment. *See, e.g., Aka v. Washington Hospital Center,* 156 F.3d 1284, 1288 (D.C.Cir.1998).

### A.   The Subscriber Limits Provision

#### 1.   The Standard of Review

■ Time Warner argues that the subscriber limits provision is a content-based restriction of its ability to communicate with its audience, and as such is subject to strict scrutiny. *See Turner Broadcasting System, Inc. v. Federal Communications Comm'n (Turner I),* 512 U.S. 622, 642, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994) (Court has applied "the most exacting scrutiny to regulations that suppress, disadvantage, or impose differential burdens upon speech because of its content"). The Government denies that the subscriber limits provision is content-based, and argues for an intermediate level of scrutiny. *See id.*

■ In order to determine the applicable standard of review, then, we must decide whether the subscriber limits provision is content-based. In general, the "principal inquiry in determining content neutrality ... is whether the government has adopted a regulation of speech because of [agreement or] disagreement with the message it conveys." *Id.* (quoting *Ward v. Rock Against Racism,* 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989)). A law that singles out speech based upon the ideas or views expressed is content-based, whereas a law that "confer[s] benefits or impose[s] burdens on speech without reference to the ideas or views expressed" is most likely content-neutral. *Id.* at 643, 114 S.Ct. 2445; *see also id.* at 661, 114 S.Ct. 2445 (law that does not "pose ...

inherent dangers to free expression, or present ... potential for censorship or manipulation, [will not] ... justify application of the most exacting level of First Amendment scrutiny").

As a cable operator, Time Warner exercises editorial discretion in selecting the programming it will make available to its subscribers. Time Warner argues that the Congress limited its ability to speak by restricting the number of subscribers—and therefore potential viewers—it may reach with the programming it has selected. That this limitation is content-based, according to Time Warner, is evident from the Senate Report that accompanied the final version of the 1992 Cable Act. *See* H.R. CONF. REP. No. 102–862, at 81–82 (1992), *reprinted in* 1992 U.S.C.C.A.N. 1133, 1133, 1263–64 (adopting provisions of Senate Bill, as described in Senate Report, S.REP. No. 102–92, at 32 (1991) [hereinafter S. REP.] ).

That Report indicated the Congress was concerned about increasing concentration of ownership and control in the cable industry:

> ... First, there are special concerns about concentration of the media in the hands of a few who may control the dissemination of information. The concern is that the media gatekeepers will (1) slant information according to their own biases, or (2) provide no outlet for unorthodox or unpopular speech because it does not sell well, or both....

> .     .     .     .     .

> The second concern about horizontal concentration is that it can be the basis of anticompetitive acts. For example, a market that is dominated by one buyer of a product, a monopsonist, does not give the seller any of the benefits of competition....

S. REP. at 32–33, 1992 U.S.C.C.A.N. at 1165–66.

Time Warner contends that the Congress's concern that media gatekeepers would "slant" information or fail to provide

outlets for "unorthodox" speech reflects a preference for one type of content and an intent to suppress another, namely, the speech of cable operators. The Company likens the Congress's efforts to limit its speech to the restraints the Supreme Court held unconstitutional in *Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), and *First National Bank of Boston v. Bellotti,* 435 U.S. 765, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978). *Buckley* involved a federal campaign finance law aimed at "equalizing the relative ability of individuals and groups to influence the outcome of elections" by limiting their political expenditures. *Id.* at 48, 96 S.Ct. 612. The Court rejected "the concept that government may restrict the speech of some elements of our society in order to enhance the relative voice of others [as] wholly foreign to the First Amendment." *Id.* at 48–49, 96 S.Ct. 612. *Bellotti* similarly involved a state statute that prohibited certain types of businesses from making contributions or expenditures for the purpose of influencing particular ballot initiatives. The Court reiterated the point it had made in *Buckley*: A state's effort to control some voices in order to "enhance the relative voices" of less influential speakers "contradicts basic tenets of First Amendment jurisprudence." *Bellotti,* 435 U.S. at 791 n. 30, 98 S.Ct. 1407 (noting exception "in the special context of limited access to the channels of communication" and citing *Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969)).

The expenditure limit at issue in *Buckley,* like the prohibition at issue in *Bellotti,* was content-based because it "was concerned with the communicative impact of the regulated speech." *Turner I,* 512 U.S. at 658, 114 S.Ct. 2445. As the Supreme Court made quite clear in *Turner I,* however, making way for some speakers, in the cable context where that necessarily means limiting the speech of others, is not inherently content-based. *Id.* at 643–45, 114 S.Ct. 2445. There the Court determined that the "must-carry" provision of the 1992 Cable Act, which required cable operators to "carry the signals of a specified number of local broadcast television stations," *id.* at 630, 114 S.Ct. 2445, was not content-based, and applied intermediate scrutiny in its review of that provision. Although the must-carry obligation restricted cable operators' speech by limiting the number of channels they could program at will, it did so in a content-neutral fashion and for a content-neutral reason, namely, to protect the interests of non-cable subscribers in maintaining the viability of the television broadcasting industry. *Id.* at 646, 114 S.Ct. 2445.

According to Time Warner, the subscriber limits provision expresses a hostility to the content of large cable operators' speech that did not underlie the must-carry obligation: The subscriber limits are meant to restrict large cable operators from presenting information in accord with their own "biases," in order thereby to promote a diversity of views in cable programming. Increasing the diversity of programming is not, Time Warner argues, among the ends the Supreme Court deemed content-neutral in *Turner I.*

Time Warner is correct that the Court's acceptance of the must-carry obligation as content-neutral rested in large part upon the Court's understanding that the purpose of the statute was to maintain the availability of broadcast television for those without cable; that does not render *Turner I* wholly inapplicable, however. The Court also identified the "bottleneck monopoly power" of the cable operator, arising out of the operator's "control over most (if not all) of the television programming that is channeled into the subscriber's home," as the threat to broadcast television. 512 U.S. at 656–57, 661, 114 S.Ct. 2445. In enacting the subscriber limits, the Congress was concerned that cable operators might use that same bottleneck power to exclude other providers of cable programming. As with the must-carry obligation, its concern was not with what a

cable operator might say, but that it might not let others say anything at all in the principal medium for reaching much of the public. *See id.* at 657, 114 S.Ct. 2445 ("The First Amendment's command that government not impede the freedom of speech does not disable the government from taking steps to ensure that private interests not restrict, through physical control of a critical pathway of communication, the free flow of information and ideas"). The must-carry obligation and the subscriber limits provision both preserve for consumers some competition in the provision of programming. The must-carry obligation preserves competition between broadcasters and the cable operator, while the subscriber limits preserve competition between the cable operator and its affiliated programmers on the one hand and unaffiliated providers of cable programming on the other. By placing a value upon diversity and competition in cable programming the Congress did not necessarily also value one speaker, or one type of speech, over another; it merely expressed its intention that there continue to be multiple speakers.

Finally, Time Warner argues that the subscriber limits provision improperly singles out for regulation the cable medium, as opposed to other video programmers such as Direct Broadcast Satellite (DBS) operators. Here it refers us to *Turner I,* 512 U.S. at 659, 114 S.Ct. 2445, where the Court observed, "Regulations that discriminate among media, or among different speakers within a single medium, often present serious First Amendment concerns." According to Time Warner, with the subscriber limits the Congress "targeted a small number of [the various] speakers" capable of purchasing and providing video programming, *id.* at 660, 114 S.Ct. 2445, without providing any justification for limiting the regulation to the cable medium.

In *Turner I,* however, the Court rejected Turner Broadcasting's claim of discrimination, stating that "[i]t would be error to

conclude ... that the First Amendment mandates strict scrutiny for any speech regulation that applies to one medium (or a subset thereof) but not others." *Id.* at 660, 114 S.Ct. 2445. Indeed, the same unique characteristic of the cable medium that justified the imposition of the must-carry obligation is also invoked by the Government to justify the subscriber limits, namely, "the bottleneck monopoly power exercised by cable operators." *Id.* at 661, 114 S.Ct. 2445. In *Turner I* this bottleneck power was seen to jeopardize the viability of broadcast television; in this case, it arguably threatens diversity and competition in the provision of cable programming. As the Government notes, other video programmers such as DBS lack the bottleneck power of cable operators; nor do they reach nearly as many households as does cable.

In sum, upon examination of the statute, the Senate Report that accompanied it, and the Supreme Court's analysis of the must-carry provision at issue in *Turner I,* we conclude that the subscriber limits provision is not content-based. In order to determine whether it is constitutional, therefore, we apply intermediate, rather than strict scrutiny. *Id.* at 662, 114 S.Ct. 2445.

### 2. The Merits

A content-neutral regulation of speech "will be sustained under the First Amendment if it [1] advances important governmental interests unrelated to the suppression of free speech and [2] does not burden substantially more speech than necessary to further those interests." *Turner Broadcasting System, Inc. v. Federal Communications Comm'n (Turner II),* 520 U.S. 180, 189, 117 S.Ct. 1174, 137 L.Ed.2d 369 (1997) (citing *United States v. O'Brien,* 391 U.S. 367, 377, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968)). If a regulation on speech is intended to redress an actual or an anticipated harm to an important governmental interest, then the Government "must demonstrate that the recited harms

are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *Turner I*, 512 U.S. at 664, 114 S.Ct. 2445. Our review of the Congress's predictive judgments is deferential; we ask only whether, "in formulating its judgments, Congress has drawn reasonable inferences based on substantial evidence." *Turner II*, 520 U.S. at 195, 117 S.Ct. 1174. Finally, we will uphold a regulation if the important governmental interest in question "would be achieved less effectively absent the regulation" and the regulation does not "burden substantially more speech than is necessary to further that interest." *Id.* at 213–14, 117 S.Ct. 1174 (quoting *Turner I*, 512 U.S. at 662, 114 S.Ct. 2445).

As to advancing an important governmental interest, the Congress enacted the subscriber limits based upon two stated concerns: that cable operators would impose their own biases upon the information they disseminate, and that a few dominant cable operators might preclude new programming services from attaining the critical mass audience necessary to survive. *See* S. REP. at 32–33. Time Warner does not argue that the Congress failed to identify an important governmental interest, but rather faults the Congress for having acted without having made findings, and without having evidence upon which it could have made findings, that either of these problems is a real one. *See, e.g., Reno v. American Civil Liberties Union*, 521 U.S. 844, 117 S.Ct. 2329, 2348, 138 L.Ed.2d 874 (1997) (invalidating portion of Communications Decency Act "in the light of the absence of any detailed findings by the Congress, or even hearings addressing the special problems of the CDA").

According to Time Warner, cable operators in fact can neither bias the flow of information nor obstruct the expression of unpopular speech because other statutory provisions require them to carry independent programming, including public, educational, and governmental (PEG) pro-

gramming, and the programming on leased access channels and local broadcast stations. *See* 47 U.S.C. §§ 531, 532, 534 & 535. As for the concern that cable operators might erect barriers to the entry of new programming services, Time Warner argues that the Congress did not establish either that cable operators have attempted to exclude new cable programmers, or that they have an incentive to do so.

The Government responds that the promotion of diversity in ideas and speech, as well as the preservation of competition, are important governmental interests, and that the Congress reasonably viewed increased concentration in the cable industry as a threat to both diversity and competition. The Government acknowledges that the 1992 Cable Act requires cable operators to carry PEG and several other types of local programming, but argues that these requirements were not meant directly to preserve competition, nor do they promote diversity in the sources of cable programming at the national level.

The Senate Report accompanying the 1992 Cable Act noted that concentration of ownership had increased dramatically: By 1990, the five largest cable operators served nearly half the country's cable subscribers. S. REP. at 32. Witnesses testified that as a result of this increase in concentration "the large MSOs [multiple system operators] have the market power to determine what programming services can 'make it' on cable." S. REP. at 33, 1992 U.S.C.C.A.N. at 1167. Based upon this and related evidence, the Congress found that "[t]he potential effects of . . . concentration [in the cable industry] are barriers to entry for new programmers and a reduction in the number of media voices available to consumers." 47 U.S.C. § 521(a)(4). It also found that "[t]here is a substantial governmental and First Amendment interest in promoting a diversity of views provided through multiple technology media." *Id.* § 521(a)(6). We conclude that the Congress drew reasonable inferences, based upon substantial ev-

idence, that increases in the concentration of cable operators threatened diversity and competition in the cable industry. *See Turner II*, 520 U.S. at 195–96, 117 S.Ct. 1174 (discussing deference due to Congress's findings).

As to burdening more speech than necessary, Time Warner argues that subscriber limits will not increase the diversity of information sources available to the public in any locale. Nor, we are told, are subscriber limits necessary in order to promote competition; the antitrust laws, as well as the antidiscrimination provision of the 1992 Cable Act, *see* 47 U.S.C. § 536(a)(3), provide a sufficient check upon any potentially anticompetitive conduct by cable operators.

Although we cannot say that a national ownership cap will surely increase the diversity of programming available at the local level, neither are we required to do so in order to uphold the statute as constitutional. *See, e.g., United States v. Albertini*, 472 U.S. 675, 689, 105 S.Ct. 2897, 86 L.Ed.2d 536 (1985) ("The validity of [a] regulation[ ] does not turn on a judge's agreement with the responsible decisionmaker concerning the most appropriate method for promoting significant government interests"). It is enough that, having determined that "[c]oncentration has grown dramatically in the cable industry," S. REP. at 32, 1992 U.S.C.C.A.N. at 1165, the Congress reasonably concluded that this concentration threatened the diversity of information available to the public and could form a barrier to the entry of new cable programmers. That is hardly an unreasonable inference. *See Federal Communications Comm'n v. National Citizens Committee for Broadcasting*, 436 U.S. 775, 780, 98 S.Ct. 2096, 56 L.Ed.2d 697 (1978); PHILLIP E. AREEDA ET AL., ANTITRUST LAW ¶ 420a (1995).

Nor is it a fatal flaw that the subscriber limits provision focuses upon behavior already arguably proscribed by other laws. In the subscriber limits provision the Congress took a structural approach to the regulation of cable operators, whereas the antidiscrimination provision of the 1992 Cable Act and the antitrust laws are behavioral prohibitions. As a structural limitation, the subscriber limits provision adds a prophylaxis to the law and avoids the burden of individual proceedings to remedy particular instances of anticompetitive behavior. *Cf. Turner II*, 520 U.S. at 222–23, 117 S.Ct. 1174 (dismissing petitioner's suggestion that antitrust enforcement or an administrative complaint procedure is an adequate alternative to must-carry obligation: "Congress could conclude ... that the considerable expense and delay inherent in antitrust litigation, and the great disparities in wealth and sophistication between the average independent broadcast station and average cable system operator, would make these remedies inadequate substitutes"). In sum, Time Warner has not demonstrated that the subscriber limits provision is on its face either unnecessary or unnecessarily overburdensome.

## B. The Channel Occupancy Provision

### 1. The Standard of Review

■ The channel occupancy provision requires the Commission to establish limits upon "the number of channels on a cable system that can be occupied by a video programmer in which a cable operator has an attributable interest." 47 U.S.C. § 533(f)(1)(B). Time Warner likens this provision to "a law prohibiting newspapers from devoting more than a fraction of their columns to editorial content of their own." That this restriction is content-based, it argues, is evident from the Senate Report:

Vertical integration in the cable industry .... gives cable operators the incentive and ability to favor their affiliated programming services. For example, the cable operator might give its affiliated programmer a more desirable channel position than another programmer, or even refuse to carry other programmers.

[The channel occupancy provision] is designed to increase the diversity of voices available to the public. Some [MSOs] own many programming services. It would be unreasonable for them to occupy a large percentage of channels on a cable system.

The intent of this provision is to place reasonable limits on the number of channels that can be occupied by each MSO's programming services.

S. REP. at 25, 80, 1992 U.S.C.C.A.N. at 1158, 1213.

Time Warner argues that because the Congress expressed concern that cable operators might favor their affiliated programming services the legislature's "stated design was to suppress cable operators' speech," and to advance the speech of nonaffiliated programmers. Again analogizing itself to a newspaper publisher, *see Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241, 255–56, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974), Time Warner argues that a cable operator has a constitutional right to favor its own speech. By interfering with that right in order to alter the mix of programming available on cable, the Congress has impermissibly regulated the content of cable operators' speech.

A cable operator is unlike a newspaper publisher, however, in the one respect crucial to the Congress's reason for enacting the channel occupancy provision: A newspaper publisher does not have the ability to exclude competing publications from its subscribers' homes. The cable operator's bottleneck monopoly is a physical and economic barrier to such intra-medium competition. The channel occupancy provision responds in kind, without regard to the content of either the cable operator's speech or that of the unaffiliated programmer for which it secures an outlet. *See Turner I*, 512 U.S. at 656, 114 S.Ct. 2445.

Nor does the Congress's wanting to ensure a multiplicity of voices on cable inherently bespeak a preference for or a bias against the content of any speech. That is why, in *Time Warner*, we upheld under intermediate scrutiny the "leased access provision" of the 1992 Cable Act. That provision requires cable operators to set aside a percentage of their channels for commercial use by unaffiliated programmers in order both to bring "the widest possible diversity of information sources" to cable subscribers and "to promote competition in the delivery of diverse sources of video programming." 93 F.3d at 968–69. In that case, we rejected Time Warner's argument that the leased access provision was a content-based restriction, and therefore subject to strict scrutiny, because nothing in the statute favored or disfavored speech on the basis of its content: "The statutory objective ... [is] framed in terms of the sources of information rather than the substance of the information." *Id.* at 969 (citing *Associated Press v. United States*, 326 U.S. 1, 20, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945)).

Time Warner now argues that whereas the objective of the leased access provision was to promote speech from various sources without regard to content, the channel occupancy provision is meant to limit speech from a particular type of source and therefore necessarily imposes a content-based restriction. Here it refers us to the statement in the Senate Report that cable operators may have "the incentive and ability to favor" their own or an affiliate's speech. S. REP. at 25, 1992 U.S.C.C.A.N. at 1158. In response, the Government explains, and we agree, that the legislative concern was not with the speech of a particular source but solely with promoting diversity and competition in the cable industry. Like the leased access provision, that is, the focus of the channel occupancy provision is upon the source of speech, not its content. *See Time Warner*, 93 F.3d at 969 (the "qualification [of nonaffiliates] to lease time on [a cable operator's] channels depends not on the content of their speech, but on their lack of affiliation with the operator, a distinguishing characteristic stemming from

considerations relating to the structure of cable television").

We recognize, of course, the possibility that a seemingly neutral limitation may have been crafted in such a way as to single out for regulation the speech of some group that the legislature finds objectionable. *See Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue*, 460 U.S. 575, 580, 592, 103 S.Ct. 1365, 75 L.Ed.2d 295 (1983) (noting that result in *Grosjean v. American Press Co.*, 297 U.S. 233, 56 S.Ct. 444, 80 L.Ed. 660 (1936), "may have been attributable in part to the perception on the part of the Court that the State imposed the tax with an intent to penalize a selected group of newspapers"). There is not a shred of evidence, however, that such an illicit consideration underlies the channel occupancy provision, and indeed Time Warner stops well short of claiming otherwise. We are therefore confident that the channel occupancy provision is content-neutral and subject only to intermediate scrutiny.

### 2. The Merits

■ In applying intermediate scrutiny, we inquire "not whether Congress, as an objective matter, was correct" that the channel occupancy provision is necessary to increase the diversity of voices available to the public via cable, but rather "whether the legislative conclusion was reasonable and supported by substantial evidence in the record before Congress." *Turner II*, 520 U.S. at 211, 117 S.Ct. 1174. Time Warner argues that the Congress's reason for enacting the channel occupancy provision—to prevent cable operators from favoring affiliated programmers and possibly even excluding others—addresses only a speculative harm because the Congress had no evidence that such exclusionary conduct actually had occurred. On the contrary, Time Warner contends, a cable operator has an incentive to contract with unaffiliated programmers to the extent that doing so will increase the attractiveness of the video programming packages it

offers to subscribers; this incentive is reinforced by increased competition from DBS and other alternative providers of video programming.

Nothing in these protestations demonstrates that the Congress's legislative conclusion was either unreasonable or unsupported by substantial evidence. *See Turner II*, 520 U.S. at 211, 117 S.Ct. 1174. The findings in the 1992 Cable Act document the Congress's concerns with affiliation between cable operators and cable programmers:

> The cable industry has become vertically integrated; cable operators and cable programmers often have common ownership. As a result, cable operators have the incentive and ability to favor their affiliated programmers. This could make it more difficult for noncable-affiliated programmers to secure carriage on cable systems. Vertically integrated program suppliers also have the incentive and ability to favor their affiliated cable operators over nonaffiliated cable operators and programming distributors using other technologies.

47 U.S.C. § 521(a)(5). The Senate Report accompanying the Act discusses the evidence upon which the Congress based these conclusions. Time Warner is of course correct that a cable operator has an incentive to offer an attractive package of programs to consumers, but the company does not deny that a cable operator also has an incentive to favor its affiliated programmers; where the two forces are in conflict, the operator may, as a rational profit-maximizer, compromise the consumers' interests. Hence, the concern of the Congress is well grounded in the evidence and a bit of economic common sense.

Finally, Time Warner argues that the channel occupancy provision is unnecessary in light of the anti-discrimination provision of the 1992 Cable Act as well as the antitrust laws. As we noted earlier, however, a prophylactic, structural limitation is not rendered unnecessary merely because preexisting statutes impose behavioral

norms and *ex post* remedies. *Cf. Turner II*, 520 U.S. at 222–23, 117 S.Ct. 1174.

### III. Conclusion

For the foregoing reasons, we conclude that the subscriber limits and channel occupancy provisions do not run afoul of the first amendment. The judgment of the district court is reversed insofar as it held that the subscriber limits provision is unconstitutional, and affirmed insofar as it held that the channel occupancy provision is constitutional.

*So ordered.*